UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA

    - against -

JESSIE SPILLER,

          Defendant.

------------------------------------X

09 Cr. 223 (RWS)

SENTENCING OPINION

**Sweet, D.J.**


       On May 9, 2013, Jessie Spiller ("Spiller" or the "Defendant") pled guilty to Conspiracy to Distribute and Possess with Intent to Distribute Cocaine in violation of 21 U.S.C. §846, a Class B Felony. For the reasons set forth below, Spiller will be sentenced to 60 months' imprisonment to be followed by a period of 4 years' supervised release. Spiller shall forfeit to the United States any and all property constituting or derived from any proceeds the Defendant obtained directly or indirectly as a result of the said violation and any and all property used or intended to be used in any manner or part to commit and to facilitate the commission of the narcotics violation alleged in Count 1, including but not limited to a sum of money representing the amount of proceeds obtained as a result of the controlled substance offense

1

for which Defendant is liable. Defendant is also required to pay a special assessment of $100.

## Prior Proceedings

Defendant was named in a one-count Information 13-CR-223 (RWS) in the Southern District of New York on March 25, 2013. Count 1 charges that from at least September 2012, in the Southern District of New York and elsewhere, Spiller and others conspired to distribute and possessed with the intent to distribute 500 grams and more of mixtures and substances containing a detectable amount of cocaine, in violation of 21 U.S.C. § 841 (b)(1)(B).

On May, 9, 2013, Defendant appeared before the Honorable Gabriel W. Gorenstein in the Southern District of New York and allocuted to Count 1 in accordance with a plea agreement which stipulates the following:

Offense Level

a. The Guideline applicable to the offense charged in Count 1 is § 2D 1.1.

b. Pursuant to U.S.S.G. §2D1.1(c)(6), the base offense level for Count 1 is 28, because the defendant conspired to distribute and possess with the intent

to distribute at least 2 kilograms, but not more than 3.5 kilograms, of cocaine.

c. Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. §3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, an additional one-level reduction is warranted, pursuant to U.S.S.G. §3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

d. In accordance with the above, the applicable Guidelines offense level is 25.

Criminal History Category

a. Based upon the information now available to the Government (including representations by the defense), the defendant has 3 criminal history points, and the defendant's Criminal History Category is II.

Sentencing Range

a. Based upon the calculations set forth above, the defendant's stipulated Guidelines range is 63 to 78 months' imprisonment, with a mandatory minimum term of 60 months' imprisonment (the "Stipulated Guidelines Range"). In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2. At Guidelines

level 25, the applicable fine range is $10,000 to $5,000,000.

b. The parties agree that neither a downward nor an upward departure from the Stipulated Guidelines Range set forth above is warranted. Accordingly, neither party will seek any departure or adjustment pursuant to the Guidelines that is not set forth herein. Nor will either party suggest that the Probation Office consider such a departure or adjustment under the Guidelines, or suggest that the Court consider any such departure or adjustment.

c. The parties agree that either party may seek a sentence outside of the Stipulated Guidelines Range, suggest that the Probation Office consider a sentence outside of the Stipulated Guidelines Range, and suggest that the Court consider a sentence outside of the Stipulated Guidelines Range, based upon the factors to be considered in imposing a sentence pursuant to 18 USC 3553(a).

Sentencing is scheduled for May 27, 2014.

**The Sentencing Framework**

In accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the Advisory Guidelines:

4

(1)   the nature and circumstances of the offense and the
history and characteristics of the defendant;

(2)   the need for the sentence imposed —

    (A)   to reflect the seriousness of the offense, to
promote respect for the law, and to provide
just punishment for the offense;

    (B)   to afford adequate deterrence to criminal
conduct;

    (C)   to protect the public from further crimes of
the defendant; and

    (D)   to provide the defendant with needed
educational or vocational training, medical
care, or other correctional treatment in the
most effective manner;

(3)   the kinds of sentences available;

(4)   the kinds of sentence and the sentencing range
established for —

    (A)   the applicable category of offense committed
by the applicable category of defendant as set
forth in the guidelines . . .;

(5)   any pertinent policy statement . . . [issued
by the Sentencing Commission];

(6)   the need to avoid unwarranted sentence
disparities among defendants with similar
records who have been found guilty of similar
conduct; and

(7)   the need to provide restitution to any victims of
the offense.

18 U.S.C. § 3553(a). A sentencing judge is permitted to find all

the facts appropriate for determining a sentence, whether that

sentence is a so-called Guidelines sentence or not. See Crosby,

397 F.3d at 114-15.

## The Defendant

The Court adopts the facts set forth in the Presentence Investigation Report ("PSR") with respect to the Defendant's personal and family history.

## The Offense Conduct

The following description draws from the PSR. The specific facts of the underlying conduct are adopted as set forth in that document.

The investigation was conducted by a detective with the United States Department of Homeland Security, Homeland Security Investigation ("HIS"). HSI conducted the investigation with the assistance of an undercover law enforcement agent (the "UC"), who was posing as a member of a drug trafficking organization with international suppliers, exclusive buyers in New York, and a means to move narcotics from international suppliers from Florida to New York for distribution.

In February 2012, the UC received a telephone call from

6

a co-conspirator not named as a defendant herein ("CC-1") regarding a potential narcotics transaction. CC-1 told the UC that CC-1's contact in the Miami area would call the UC directly.

The HSI Special Agent (the "Agent") who was in charge of the investigation learned that on February 19, 2012, the UC received a telephone call from an individual, later identified as Michael Henry ("Henry"), using a particular telephone number (the "Cellphone"). Henry stated that he wanted to meet the UC in person, at which point a narcotics transaction could move forward. Later that day, the UC received a call from CC-1. CC-1 stated that Henry was the final person involved in any potential transaction.

On February 27, 2012, the UC met Henry at an agreed-upon location in Lauderhill, Florida. This meeting was surveilled and recorded. During the meeting, Henry told the UC that Henry's main cocaine source of supply was in the Dominican Republic. Henry and the UC discussed various methods for putting the narcotics on airplanes in the Dominican Republic which were destined for the Fort Lauderdale airport, and the UC's payment for assisting with the off-loading of narcotics at the airport.

Between March and July 2012, the UC spoke with Henry on the Cellphone more than ten times, regarding the UC potentially

7

assisting in the off-loading of shipments of multi-kilogram quantities of cocaine from abroad.

On August 1, 2012, the UC called Henry on the Cellphone. During this call, Henry asked the UC about a potential shipment of fifty kilograms of cocaine via cargo ship instead of via airplane. Henry also inquired about purchasing kilogram quantities of cocaine directly from the UC. Henry and the UC discussed Henry purchasing twenty kilograms of cocaine from the UC at a price of $24,000 per kilogram.

On August 7, 2012, the UC called Henry on the Cellphone. During the call, the UC informed Henry that the UC was having trouble convincing his/her distributors in New York, for whom the UC worked, to approve the narcotics transaction with Henry. Henry told the UC that if the UC could not manage the full amount (i.e., twenty kilograms) the first time, half would be fine. Henry explained that he was trying to establish a consistent, reliable connection with the UC in order to get something back in the "pipeline" because the "pipeline has been dry." Based on his investigation, the agent believed that Henry was referring to using the UC as a source of supply for cocaine, because his other suppliers were not providing enough.

8

On August 7, 2012, the UC received a phone call from Henry from the Cellphone. Henry stated that he had spoken with his "colleague" and he could increase the price for the cocaine if need be. Henry also explained that he would come to the UC to inspect the cocaine, and his source of funds, another co-conspirator not named as a defendant herein ("CC-2"), would finalize the deal by providing money at a later time. Henry stated that CC-2 had the final say. Henry stated that CC-2 was part of his team, and had "never been a dollar short," and explained that he (Henry) was the "shopper."

On August 16, 2012, the UC called Henry on the Cellphone, from New York, New York. During the call, the UC told Henry that he was in Manhattan discussing the twenty kilogram deal with his New York contacts. Henry told the UC that if the quantity was a problem for the UC's contacts in New York, the UC could split the "load" in two, and give half to Henry and leave the other half with his exclusive buyers in New York.

On August 23, 2012, the UC called Henry on the Cellphone. During the call, the UC told Henry that everything was ready for the scheduled twenty-kilogram cocaine deal, and that the UC's contacts in New York gave him the approval. Henry told the UC that

9

he was recently stopped by the police in Mississippi, who searched his car and seized a half-million dollars, which was the money Henry had ready to pay the UC. Henry told the UC that "all may not be totally lost," because he (Henry) would check with his "team" about "reserves" to pay the UC for some portion of the cocaine.

Based upon the Agent's review of reports from the Richland Police Department, he learned that an individual named "Michael Henry" was stopped at a traffic stop in Rankin County, Mississippi, by local law enforcement on August 22, 2012, and consented to the search of his vehicle. During that search, a "trap" was located in the vehicle, which contained three duffel bags. The duffel bags in turn contained a total of $448,570.00 and two firearms, namely, a .45-caliber Colt MKIV Series 70 and a 9mm Beretta M9 pistol. The Richland Police Department seized the firearms, the currency, and the vehicle. Henry acknowledged he knew money was hidden in the trap, but he did not know where the trap was, the amount of money he was carrying, or that there were guns in the trap until he was told by the police. He was later released.

On August 27, 2012, the UC called Henry on the Cellphone. During the call, Henry told the UC that he had another potential buyer in the Miami, Florida, area willing to purchase some amount

of the twenty kilograms of cocaine from the UC that he (Henry) was unable to afford, due to the seizure of his money. The UC told Henry that the twenty kilograms were still available for purchase, but that the UC was only comfortable dealing directly with Henry.

On August 28, 2012, the UC met with Henry in Lauderhill, Florida. This meeting was surveilled and recorded. Henry was shown one kilogram of cocaine as a sample of the product that the UC would provide. Henry told the UC that he would go forward with the purchase of five kilograms of cocaine. Henry also showed the UC a receipt he had been given by the Richland Police Department for the seizure of the money intended for the twenty-kilogram transaction, as described above.

On September 3, 2012, the UC spoke with Henry via the Cellphone. During this call, Henry told the UC that the money was in Florida, and that he was ready to go forward with the purchase of ten kilograms of cocaine, instead of the twenty kilograms originally discussed. The UC told Henry that he needed to physically see some of the money before taking any further steps.

On September 4, 2012, the UC met with Henry in Lauderhill, Florida. This meeting was surveilled by law enforcement and recorded. Henry told the UC that money was being

11

brought to the location by other individuals, who were driving nearby, so that the UC could personally see it. The UC saw Henry place a call, and overheard Henry tell the individual on the phone the location where Henry and the UC were, and that the UC needed to see the money. After this phone call, Henry told the UC that they were on their way with money for two of the ten kilograms, so that the UC could personally see it, and should be there shortly. A vehicle then pulled up beside the UC and Henry, driven by an individual later identified as Spiller and with another co-conspirator not named as a defendant herein ("CC-3") in the passenger seat. Henry told the UC "here they are." CC-3 got out of the vehicle, and offered his seat to the UC. The UC declined, and said that he just needed to see the money. The Defendant reached into the backseat of the vehicle and showed the UC two clear plastic bags containing what appeared to be stacked U.S. currency. The UC asked Spiller whether that is "one for each" (referring to the kilograms of cocaine), and Spiller replied that it was.

After the money was shown to the UC, law enforcement approached Henry, Spiller and CC-3. Henry was placed under arrest. Spiller and CC-3 sped away in the vehicle. During a car chase, CC-3 threw the money out of the window.

After receiving *Miranda* warnings, Henry spoke with law

12

enforcement agents and stated that he was meeting with the UC in order to broker a narcotics transaction. Henry made a commission on each deal he brokered. Henry knew the driver of the vehicle, Spiller, as "J." Henry had split his commissions with Spiller in the past. Henry was brokering the 20-kilogram narcotics transaction for Spiller.  Spiller was providing the money for this narcotics transaction, because Spiller and his "people" wanted that product.  Henry was told by Spiller that the money for the narcotics transaction arranged with the UC would be available in Florida on either September 2 or 3.

Spiller is being held accountable for at least 2 kilograms but less that 3.5 kilograms of cocaine, the amount he and Michael Henry were capable of purchasing during their September 4, 2012 meeting with the UC.

**The Relevant Statutory Provisions**

For Count 1, the mandatory minimum term of imprisonment is 5 years and the maximum term is 40 years pursuant to 21 U.S.C. §§ 841(b)(1)(B) and 846. The mandatory minimum term of supervised release is four years and the maximum term is lifetime supervised release pursuant to 21 U.S.C. §§ 841(b)(1)(B) and 846.

13

The Defendant is not eligible for probation for Count 1, as the offense is a Class B felony, pursuant to 18 U.S.C. § 3561(a)(1), and the offense is an offense for which probation has been expressly precluded, pursuant to 18 U.S.C. § 3561(a)(2).

The maximum fine for Count 1 is $5 million, pursuant to 21 U.S.C. §§ 841(b)(1)(B) and 846.  A special assessment of $100 is mandatory, pursuant to 18 U.S.C. § 3013.

Pursuant to 21 U.S.C. § 862(a)(1)(B), upon a second conviction for distribution of a controlled substance, a defendant may be declared ineligible for any or all Federal benefits for up to ten years as determined by the Court.

As part of his plea and as a result of committing the offenses alleged in Count 1, the Defendant shall forfeit to the U.S., pursuant to 18 U.S.C. §§ 1963(a)(1), (a)(2), and (a)(3), all property real and personal, involved in the offense or traceable to such property.

Pursuant to Rule 32.2, "[t]he Court must include the forfeiture when orally announcing the sentence or must otherwise ensure that the Defendant knows of the forfeiture at sentencing. The Court must also include the forfeiture order, directly or by

14

reference, in the judgment."

## The Guidelines

The November 1, 2013 edition of the <u>United States</u> <u>Sentencing Commission Guidelines Manual</u> has been used in this case for calculation purposes, pursuant to § 1B1.11(a). The Court finds the following with respect to the Defendant's applicable offense level, criminal history, recognition of responsibility, and term of imprisonment:

The applicable guideline for violations of 21 U.S.C. §§ 841(b)(1)(B) and 846 is found in § 2D1.1 of the Guidelines. Section 2D1.1(a)(5) states that the base offense level is that specified in the Drug Quantity Table set forth in subsection (c). The parties agree that the Defendant conspired to distribute at least 2 kilograms but less than 3.5 kilograms of cocaine. Pursuant to § 2D1.1(c)(6), the base offense level is 28.

Based on his plea allocution, the Defendant has shown recognition of responsibility for the offense; further, by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources more efficiently,

a reduction of three levels for acceptance of responsibility is considered applicable under § 3E1.1(a) and (b).

The total offense level for Count 1 is 25.

The Defendant has two prior adult criminal convictions.

On June 6, 1996, the Defendant was sentenced for possession of cocaine with intent to distribute in the Circuit Court in Norfolk, VA. The Defendant was sentenced to 15 years' imprisonment (suspended), 7 years' probation and 90 days' imprisonment (boot camp). Pursuant to § 4A1.2(e)(2), this conviction warrants zero criminal history points.

On August 6, 2012, the Defendant was sentenced to one count of theft by receiving stolen property and two counts of receipt, possession or transfer of firearm by convicted felon or felony first offender in the Superior Court in Cobb County, GA. The Defendant was sentenced to 5 years' probation on each count. Pursuant to § 4A1.1(c), this conviction warrants one criminal history point.

The criminal convictions above result in a subtotal criminal history score of 1. At the time the instant offense was

16

committed, the Defendant was on probation. Pursuant to § 4A1.1(d), two points are added.

The total criminal history points is 3. According to the sentencing table at Chapter 5, Part A, 3 criminal history points establish a Criminal History Category of II.

Based on a total offense level of 25 and a Criminal History Category of II, the same level indicated in the plea agreement, the applicable guideline range of imprisonment is 63 to 78 months, with a mandatory minimum term of 60 months' imprisonment.

Pursuant to § 5D1.1(a), the court must order a term of supervised release to follow imprisonment when a sentence of imprisonment of more than one year is imposed, or when required by statute, for Count 1. The term of supervised release shall be at least four years but not more than five years pursuant to §§ 5D1.2(a)(1) and (c).

The Defendant is not eligible for probation, as the offense is a Class B felony, as pursuant to § 5B1.1(b)(1), and the offense is an offense for which probation has been expressly precluded, pursuant to § 5B1.1(b)(2).

For Count 1, the applicable fine range is from $10,000 to $5,000,000, pursuant to §§ 5E1.2(c)(3)(A) and (c)(4). Subject to the Defendant's ability to pay, in imposing a fine, the Court shall consider the expected costs to the Government of any imprisonment, probation, or supervised release pursuant to §5E1.2(d)(7). A recent advisory from the Administrative Office of the United States Courts suggests a monthly cost of $2,412.33 to be used for imprisonment, a monthly cost of $278.95 for supervision, and a monthly cost of $2,244.17 for community confinement.

Pursuant to § 5F1.6, the Court may deny eligibility for certain Federal benefits of any individual convicted of distribution or possession of a controlled substance.

## The Remaining Factors of 18 U.S.C. § 3553(a)

Having engaged in the Guidelines analysis, this Court also gives due consideration to the remaining factors identified in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not greater than necessary," as is required by the Supreme Court's decision in Booker, 543 U.S. 220, and the Second Circuit's decision in Crosby, 397 F.3d 103. In light of the Court's statutory

18

responsibility "to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," Kimbrough v. United States, 552 U.S. 85, 102 (2007) (quoting 18 U.S.C. § 3553(a)), and having considered the Guidelines and all of the factors set forth in § 3553(a), it is determined that a Guidelines sentence is not warranted in the instant case.

The Guidelines advise that a sentence of 63 to 78 months imprisonment is warranted in this case. The charge of conviction also carries a mandatory minimum 60 months' imprisonment. The Court believes that a sentence of 60 months' imprisonment is "sufficient, but not greater than necessary" to address the objectives of sentencing as set forth in 18 U.S.C. § 3553.

## The Sentence

For the instant offense, Spiller will be sentenced to 60 months' imprisonment to be followed by 4 years' supervised release.

As mandatory conditions of his supervised release, Defendant shall:

(1) Not commit another federal, state or local crime;

19

(2) Not illegally possess a controlled substance;

(3) Not possess a firearm or destructive device;

The mandatory drug testing condition is suspended due to imposition of a special condition requiring drug treatment and testing.

The standard conditions of supervision (1-13) are imposed with the following special conditions:

1.    The Defendant shall provide the probation officer with access to any requested financial information.

2.    The Defendant will participate in a program approved by the United States Probation Office, which program may include testing to determine whether the Defendant has reverted to using drugs or alcohol. The Court authorizes the release of available drug treatment evaluations and reports to the substance abuse treatment provider, as approved by the Probation Officer. The Defendant will be required to contribute to the costs of services rendered (co-payment), in an amount determined by the probation officer, based on ability to pay or availability of the third-party payment.

3.    The Defendant shall submit his person, residence, place of business, vehicle, or any other premises under his control to a search on the basis that the probation officer has reasonable belief that contraband or evidence of a violation of the conditions of the release may be found. The search must be conducted at a reasonable time and in reasonable manner. Failure to submit to a search may be grounds for revocation. The Defendant shall inform any other residents that the premises may be subject to search pursuant to this condition.

The Defendant is to report to the nearest Probation Office within 72 hours of release from custody.

The Defendant does not have the ability to pay a fine and so the fine in this case is waived.

Spiller shall forfeit his interest in the following property to the United States: all property real and personal, involved in the offense or traceable to such property, pursuant to 18 U.S.C. §§ 1963(a)(1), (a)(2), and (a)(3).

The Defendant is also required to pay a special assessment of $100.

21

The Defendant is viewed as a good candidate for voluntary surrender, as he has kept all court appearances and has been in compliance with all terms and conditions of his pretrial release. He is not viewed as a flight risk or a danger to the community.

The terms of this sentence are subject to modification at the sentencing hearing scheduled for May 27, 2014.

It is so ordered.

New York, NY
May 21, 2014

ROBERT W. SWEET
U.S.D.J